[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10309

_____

LEVI GOLDFARB,
BENJAMIN GOLDFARB,

Plaintiffs-Appellees,

*versus*

RELIANCE STANDARD LIFE INSURANCE COMPANY,
an Illinois corporation,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:22-cv-60804-FAM

_____

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR and MARCUS, Circuit Judges.

JILL PRYOR, Circuit Judge:

Brothers Levi and Benjamin Goldfarb ("the Goldfarbs") sought payment of a $500,000 claim under an Accidental Death & Dismemberment insurance policy after the insured, their father, Dr. Alexander Goldfarb-Rumyantzev ("Dr. Goldfarb"), died while mountain climbing in a remote area of Pakistan. Although Dr. Goldfarb's death is uncontested, his body was never found. The insurer, Reliance Standard Life Insurance Company, denied the claim because the cause of Dr. Goldfarb's death was unknown; therefore, his beneficiaries could not show that he died by accident.

The Goldfarb brothers challenged the denial in district court under the Employee Retirement Security Act, 29 U.S.C. § 1132(a)(1)(B) ("ERISA"). The district court ruled that Dr. Goldfarb's death was accidental and that Reliance Standard's failure to pay the Accidental Death & Dismemberment claim was arbitrary and capricious. The court thus granted summary judgment to the Goldfarbs and denied Reliance Standard's cross motion for summary judgment. The insurer appeals the summary judgment and the district court's denial of its cross motion.

After careful review of the parties' briefs and the record, and with the benefit of oral argument, we disagree with the district court. Reliance Standard's decision that Dr. Goldfarb's death was

not accidental under the insurance policy was supported by reasonable grounds, and the denial of the Goldfarbs' claim for benefits was not otherwise arbitrary and capricious. Reliance Standard was thus entitled to summary judgment. We reverse the district court's grant of summary judgment to the Goldfarbs and direct the court to enter judgment in Reliance Standard's favor.

## I.    BACKGROUND

We divide our discussion of the background for this appeal into four parts. First, we describe Dr. Goldfarb's presumed death and the surrounding circumstances. Second, we set out the relevant terms of Dr. Goldfarb's Accidental Death & Dismemberment ("AD&D") insurance policy. Third, we present the Goldfarbs' claim for AD&D benefits. Fourth, we recount the case's procedural history.

### A.    Dr. Goldfarb's Climb and Disappearance

Dr. Goldfarb, age 57, vanished while attempting to summit Pastore Peak, a 6,209-meter-high mountain in Pakistan. His body was never recovered, and he is presumed dead.

By all accounts, Dr. Goldfarb was an experienced mountain climber in excellent physical condition when he traveled to Pakistan in the winter of 2020–2021. When he arrived in the country, he joined a climbing expedition with his climbing partner, Zoltan Szlanko. At that time, Szlanko had been a certified climbing instructor and professional climber since 1991, nearly 30 years. He had been climbing mountains for 38 years.

Szlanko and Dr. Goldfarb's primary goal was to ascend Broad Peak, 8,051-meters high. But first, they planned to acclimatize by climbing nearby Pastore Peak. On January 12, 2021, Dr. Goldfarb and Szlanko began their planned ascent by trekking from Broad Peak Base Camp to Pastore Peak Base Camp, which was 5,200 meters up Pastore Peak. Trekking ahead of Dr. Goldfarb, Szlanko found conditions on the mountain to be too dangerous to continue up Pastore. He returned to Dr. Goldfarb the next morning, January 13, and warned him that the route would be unsafe to traverse due to "a labyrinth of hidden crevasses either covered with loose snow or stones" and "black ice" that was "dangerously breaking" and "provid[ed] no grip." Doc. 11 at 44.[1] Seeing these dangerous conditions at lower elevations, he surmised that the conditions "must be even worse higher up the mountain." *Id*. He recommended to Dr. Goldfarb that they turn back and focus on their goal of summitting Broad Peak.

Dr. Goldfarb seemed to agree but told Szlanko that he wanted to camp on the mountain that night. He stayed on Pastore overnight while Szlanko returned to Broad Peak Base Camp. Despite having assured Szlanko that he would return to Broad Peak the following morning, Dr. Goldfarb telephoned on January 14 to inform Szlanko that he was going to continue climbing to Pastore Peak Base Camp alone. Szlanko again warned Dr. Goldfarb about the dangerous conditions on the mountain and added that a solo

---

[1] "Doc." numbers refer to district court docket entries.

climb would be even more dangerous. He told Dr. Goldfarb that he could not "take responsibility" if Dr. Goldfarb continued the climb. *Id.* Yet Dr. Goldfarb insisted on continuing the climb alone.

The next day, January 15, Dr. Goldfarb called to notify the expedition's liaison officer that he was going to attempt to summit Pastore Peak. Although Dr. Goldfarb reported that he would attempt the summit from his camp, only he knew the camp's location.

After his January 15 call, Dr. Goldfarb was never heard from again. When he stopped communicating and failed to return to Broad Peak Base Camp by January 17, Szlanko and other expedition personnel began searching for him. On January 18, rescuers in a helicopter spotted what they believed to be a lifeless body face down in the snow below an ice wall on the slope of Pastore Peak. The rescuers took aerial photographs of the scene. From the gear visible in the photographs, Szlanko identified the body as Dr. Goldfarb's. Dr. Goldfarb was the only climber on Pastore when the attempted rescue occurred.

From the location of the body, Szlanko speculated that Dr. Goldfarb fell to his death. Even if Dr. Goldfarb did not die from a fall, Szlanko opined that he could not have survived on Pastore Peak for more than four days due to the limited supplies he had brought with him and "subsequent severe snowstorms" on the mountain. *Id.* at 46.

Dr. Goldfarb's cause of death was never determined, however, because his body was never recovered. After the unsuccessful

aerial rescue mission, the body disappeared. A ground mission conducted between January 20 and January 26 failed to locate the body, the gear in the photographs, or any other trace of Dr. Goldfarb. A follow-up mission in summer 2021 turned up only a single hiking boot.

Dr. Goldfarb's disappearance on Pastore Peak led the governments of Pakistan and the United States to issue presumptive death certificates. A Massachusetts probate court declared Dr. Goldfarb dead as of January 16, 2021.

## B.    Dr. Goldfarb's Employee Benefits Plan

At the time of his presumed death, Dr. Goldfarb was employed as a Senior Medical Director at Inozyme Pharma, Inc. He was enrolled in the company's employee benefits plan, which was governed by ERISA.

The plan included a group life insurance policy provided by Reliance Standard. The policy offered both Basic Life and AD&D benefits. Based on Dr. Goldfarb's salary at Inozyme, a maximum benefit of $500,000 was available under each type of coverage.

The Basic Life benefit was payable to an insured's surviving beneficiaries when the beneficiaries provided proof of the insured's death, regardless of the cause. By contrast, the AD&D benefit for loss of life resulting from an "[i]njury" was payable only if the loss was "caused solely by an accident." Doc. 14-1 at 21. The policy did not define "accident." In circular fashion, it defined "injury" as "accidental bodily injury to an Insured that is caused directly and independently of all other causes by accidental means," without

defining accidental or accidental means. *Id.* at 11. It expressly excluded from AD&D coverage some causes of death or injury; for example, the AD&D benefit was not "payable for a loss . . . to which sickness, disease or myocardial infarction . . . [was] a contributing factor." *Id.* at 21.

The policy tasked Reliance Standard with reviewing claims and "determin[ing] eligibility for benefits," *id.* at 23, giving the insurer discretion to decide whether a loss was covered.

## C.    The Goldfarbs' Claim for Benefits

Dr. Goldfarb named his sons, Levi and Benjamin Goldfarb, as the beneficiaries of his Reliance Standard policy. After their father's death, the Goldfarbs filed claims with Reliance Standard seeking the maximum amount of both the Basic Life and the AD&D benefits. Upon receipt of Dr. Goldfarb's presumptive death certificates, Reliance Standard paid the Goldfarbs the $500,000 maximum Basic Life benefit. But it denied the AD&D claim because "it [was] not certain that [Dr.] Goldfarb . . . suffered loss of life caused solely by an accident" given that his true cause of death was unknown. Doc. 11 at 8.

The Goldfarbs appealed the denial of the AD&D benefit through Reliance Standard's appeal process, arguing that, contrary to the insurer's decision, Dr. Goldfarb's death was accidental. They noted that "the conclusion drawn by all who were there" was that Dr. Goldfarb "succumbed to the conditions" on Pastore Peak and "either fell or was blown off the mountain." *Id.* at 12. They submitted supporting documentation, including the aerial photographs

presumed to be of Dr. Goldfarb's body and Szlanko's account of his disappearance. Upon review, Reliance Standard denied the appeal and affirmed its initial decision to deny the AD&D benefit, concluding that the supporting documentation failed to substantiate that Dr. Goldfarb's death was caused solely by an "independent accident." *Id*. at 49–52.

### D.    Procedural History

After their appeal was denied, the Goldfarbs filed a complaint in federal district court, asking the court to enter final judgment ordering Reliance Standard to pay the $500,000 AD&D benefit pursuant to 29 U.S.C. § 1132(a)(1)(B) of ERISA. Section 1132(a)(1)(B) allows beneficiaries to "recover benefits due to [them] under the terms of [an ERISA] plan."

The Goldfarbs moved for summary judgment, arguing that because the evidence of Dr. Goldfarb's cause of death was inconclusive, the district court was bound to apply a legal presumption that he died by accident. Reliance Standard cross moved for summary judgment. It conceded that Dr. Goldfarb was dead and that he did not die by suicide. But it argued that to collect the AD&D benefit the Goldfarbs had to prove that Dr. Goldfarb died by accident. By acknowledging that the cause of death was inconclusive, Reliance Standard argued, the Goldfarbs failed to carry their burden.

The district court granted the Goldfarbs' motion for summary judgment and denied Reliance Standard's cross motion for summary judgment, ruling that the insurer's denial of the AD&D

benefit was arbitrary and capricious. The district court concluded that, suicide having been ruled out and in the absence of a specific policy exclusion for death while mountain climbing, Dr. Goldfarb's death was an accident under the policy. Therefore, the Goldfarbs were entitled to the AD&D benefit as a matter of law.

This is Reliance Standard's appeal.

## II.    STANDARDS OF REVIEW

"We review *de novo* a district court's ruling affirming or reversing a plan administrator's ERISA benefits decision, applying the same legal standards that governed the district court's decision." *Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1306 (11th Cir. 2016) (internal quotation marks omitted).

We also review *de novo* a district court's rulings on cross motions for summary judgment. *Signor v. Safeco Ins. Co. of Ill.*, 72 F.4th 1223, 1227 (11th Cir. 2023). Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.*

## III.    DISCUSSION

To decide whether the district court erred in granting summary judgment to the Goldfarbs—and whether it should have instead granted summary judgment to Reliance Standard—we apply federal common law for evaluating denial-of-benefits decisions under ERISA. ERISA itself offers no guidance on the appropriate level of deference to give denial-of-benefits decisions reviewed under § 1132(a)(1)(B), *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109

(1989), nor does it guide courts in interpreting the terms of employee benefits plans, *Alexandra H.*, 833 F.3d at 1306. To fill this gap, federal courts have developed a body of federal common law to govern the review, interpretation, and enforcement of ERISA benefits plans. *Id.*; *see Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1041 (11th Cir. 1998) ("Courts have the authority to develop a body of federal common law to govern issues in ERISA actions not covered by the act itself." (internal quotation marks omitted)).

This Court has adopted a federal common law framework to govern our review of ERISA plan administrators' benefits decisions. *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354–55 (11th Cir. 2011). The framework has six steps:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* at 1355.

In conducting our *de novo* review of the district court's summary-judgment ruling that Reliance Standard's denial of AD&D benefits was arbitrary and capricious, we apply this framework. *See Alexandra H.*, 833 F.3d at 1306.

In applying this framework, we can skip step one, whether the denial was "*de novo* wrong," *Blankenship*, 644 F.3d at 1355 (internal quotation marks omitted), because, at step two, we conclude that Reliance Standard was "vested with discretion in reviewing claims." *Id.*; *see also id.* at 1356–57 (skipping step one and determining reasonableness of plan administrator's discretionary denial of benefits). Dr. Goldfarb's insurance policy unambiguously stated that "Reliance Standard Life Insurance Company . . . as the claims review fiduciary . . . has the discretionary authority to interpret the

Plan and the insurance policy and to determine eligibility for benefits." Doc. 14-1 at 23; *see Hunt v. Hawthorne Assocs., Inc.*, 119 F.3d 888, 912 (11th Cir. 1997) (stating that the discretionary language triggering arbitrary and capricious review must be "express language unambiguous in its design" (internal quotation marks omitted)).

Because Reliance Standard was vested with discretion in reviewing claims, we assess, at step three, whether its denial of the AD&D claim was supported by reasonable grounds. *Blankenship*, 644 F.3d at 1355. To determine whether there were reasonable grounds for the denial, we may consider only "the material available to the administrator at the time it made its decision." *Id.* at 1354. So long as we can discern a reasonable basis for Reliance Standard's decision, it was not arbitrary or capricious, even if the evidence before the administrator would support a contrary decision. *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1140 (11th Cir. 1989). Whether the insurer's decision was reasonable is a question of law. *Blankenship*, 644 F.3d at 1354. Thus, it is appropriately decided on summary judgment.

If reasonable grounds supported Reliance Standard's denial of the AD&D benefit, we continue to steps four, five, and six of the framework, deciding whether Reliance Standard operated under a conflict of interest in denying the claim and, if so, how that conflict may affect our conclusion whether the denial was arbitrary and capricious. *Id.* at 1355.

### A.     Reliance Standard's Denial of the AD&D Claim Was Supported by Reasonable Grounds.

We begin with whether Reliance Standard's denial of the Goldfarbs' claim was supported by reasonable grounds. Reliance Standard denied the claim because "it [was] not certain that [Dr.] Goldfarb . . . suffered loss of life caused solely by an accident." Doc. 11 at 8. To decide whether Reliance Standard reasonably concluded that Dr. Goldfarb's death was not caused solely by an accident, we must interpret the policy language to find the meaning of "accident."

In the policy, Reliance Standard agreed to pay the full amount of the accidental death benefit for loss of life resulting from an "[i]njury." Doc. 14-1 at 21. Injury, in turn, was defined as "accidental bodily injury to an Insured that is caused directly and independently of all other causes by accidental means." *Id.* at 11. But "accidental" and "accidental means" were not defined.

Reliance Standard argues that we should fill this gap with the federal common law definition of accident established in *Wickman v. Northwestern National Insurance Co.*, 908 F.2d 1077 (1st Cir. 1990). The district court relied on *Wickman*, and the Goldfarbs do not argue for a different definition or otherwise dispute that *Wickman* should govern this case. We approve of its application here.

*Wickman* instructs that to determine whether a loss was caused by an accident, the court first considers the subjective expectations of the insured about the likelihood of injury from

engaging in the conduct that resulted in the loss. *Id.* at 1088. If the insured's subjective expectations are unknowable, as they are in this case, the court instead conducts "an objective analysis of the insured's expectations." *Id.* This analysis considers "whether a reasonable person, with background and characteristics similar to the insured, would have viewed [injury or death] as highly likely to occur as a result of the insured's intentional conduct." *Id.* If a reasonable person with similar characteristics to the insured would have viewed injury or death as highly likely to occur, then the death was not an accident, and the loss is not covered under an accidental death policy. *See id.* at 1088–89.

We have never applied the *Wickman* standard in a published opinion. But in *Buce v. Allianz Life Insurance Co.*, we recognized *Wickman* as part of ERISA federal common law and said that it was "sound judicial policy" to apply it "where the crucial terms of an accident policy [were] defined with surpassing vagueness, and the policy contain[ed] no general guidance as to the construction of those terms." 247 F.3d 1133, 1145–47 (11th Cir. 2001).[2] And six

---

[2] We decided that *Wickman* did not control Buce's case because his insurance policy included a choice-of-law provision requiring the policy to be interpreted according to Georgia law. *Buce*, 247 F.3d at 1147. We interpreted the vague terms in the accident policy according to the state-law doctrine of "accidental means," to which Georgia and "not . . . a small minority" of other states subscribe. *Id.* at 1144, 1147. Under the accidental-means doctrine, an injury is not accidental unless its cause was "unforeseen, unexpected, and unusual . . . as opposed to designed or intended." *Wickman*, 908 F.2d at 1085 (internal quotation marks omitted). "[I]f the act proximately leading to injury is intentional,

23-10309                  Opinion of the Court                         15

other circuits have applied *Wickman*'s definition of accident where ERISA plans failed to clearly define the term. *See Eckelberry v. Reliastar Life Ins. Co.*, 469 F.3d 340, 343–44 (4th Cir. 2006); *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 541 (5th Cir. 2012), *overruled in part on other grounds by Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246 (5th Cir. 2018) (en banc); *Kovach v. Zurich Am. Ins. Co.*, 587 F.3d 323, 336–37 (6th Cir. 2009); *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1109–11 (7th Cir. 1998); *Nichols v. Unicare Life & Health Ins. Co.*, 739 F.3d 1176, 1182–84 (8th Cir. 2014); *Wolf v. Life Ins. Co. of N. Am.*, 46 F.4th 979, 984–85 (9th Cir. 2022). These courts have adopted *Wickman* as the "uniform standard" for "determining whether an injury [or death] is accidental in ERISA cases where the word is not otherwise defined in the applicable policy." *Kovach*,

---

then so is the result." *Id.* Thus, injuries or death covered under an accidental-means policy must result from an unintentional act or an intentional act affected by an "unforeseen, unexpected, or unusual" external force. *See Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1198 (11th Cir. 2010) (internal quotation marks omitted) (interpreting Georgia law).

Dr. Goldfarb's policy contained language which, if the law of Georgia or a minority of other states applied, might require interpretation under the doctrine of accidental means. *See* Doc. 14-1 at 11 (defining injury as "caused directly and independently of all other causes by accidental means"). Absent an enforceable choice-of-law clause requiring interpretation under state law, however, federal common law applies. *See Buce*, 247 F.3d at 1142. We note that Dr. Goldfarb's policy included a Massachusetts choice-of-law provision. But because the parties never argued for the enforcement of that provision, they have forfeited the issue. *See Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1257 (11th Cir. 2006); *United States v. Campbell*, 26 F.4th 860, 871–75 (11th Cir. 2022) (en banc).

587 F.3d at 336–37 (internal quotation marks omitted). We see nothing counseling against applying the *Wickman* standard here, where accident and accidental were likewise undefined in the policy. Instead, given the acceptance of the *Wickman* standard in ERISA federal common law, deploying it in this case "give[s] . . . unity to the concept of 'accident'" in employee benefits policies. *Buce*, 247 F.3d at 1147.

Returning to the question whether Reliance Standard's denial of the AD&D claim was supported by reasonable grounds, we evaluate Reliance Standard's conclusion that the Dr. Goldfarb's death was not an accident under the *Wickman* standard: "whether a reasonable person, with background and characteristics similar to" Dr. Goldfarb, would have viewed injury or death as "highly likely to occur" from Dr. Goldfarb's attempt to summit Pastore Peak. *Wickman*, 908 F.2d at 1088. Adopting the perspective of a person with "background and characteristics" like Dr. Goldfarb's, we evaluate the risk of his climb from the perspective of an experienced mountain climber in excellent physical condition.

Even considering Dr. Goldfarb's experience and fitness, however, the known facts about his climb up Pastore Peak lead us to conclude that a reasonable mountain climber would have recognized a high likelihood of injury or death. We note that none of these facts are disputed. First, Dr. Goldfarb ascended Pastore against the advice and warnings of his climbing partner, Szlanko, a certified mountain climbing instructor with 38 years of climbing experience. After conducting reconnaissance on Pastore, Szlanko

concluded that it was too dangerous to ascend the mountain. He warned Dr. Goldfarb against the treacherous terrain, including hidden crevasses and black ice prone to breaking and offering no grip. Yet Dr. Goldfarb continued against his warnings. Second, Dr. Goldfarb ascended Pastore Peak solo, against the partners' plan, which, as Szlanko cautioned him, increased the danger of his climb. Third, Dr. Goldfarb ascended the mountain with only a limited cache of supplies, in winter conditions that Szlanko opined would have resulted in his death in a matter of days even if he did not succumb to the terrain. Fourth, Dr. Goldfarb decided to attempt to summit Pastore Peak. Although the record that was before Reliance Standard contains little information about Dr. Goldfarb's decision to attempt the summit, we know that Szlanko assumed conditions on the mountain would be worse higher up. A reasonable mountain climber likely would have expected a higher risk of injury or death from a summit attempt on an already dangerous winter climb.

We recognize that, ordinarily, an insurer must meet a "high bar" in establishing that an insured faced a reasonable expectation of injury or death under *Wickman. Kovach*, 587 F.3d at 336–37. Although the information that was before Reliance Standard supported the reasonableness of its conclusion that Dr. Goldfarb's death was not accidental, we acknowledge that decision makers applying *Wickman de novo* may not have come to the same conclusion. Such a decision maker could conclude that a reasonable mountain climber would not have judged injury or death as *"highly* likely to occur" in these circumstances. *See Wickman*, 908 F.2d at 1088

(emphasis added); *Kovach*, 587 F.3d at 336–37 (suggesting that the expected probability of injury or death must be above 75% to be "highly likely"). And because of the lack of conclusive information surrounding Dr. Goldfarb's death, some facts may be susceptible to multiple interpretations. For example, a decision maker could view Dr. Goldfarb's summit attempt as evidence that he successfully made it partway up the mountain despite the known dangers and challenges.

But because our review of Reliance Standard's decision is subject to the arbitrary-and-capricious standard, it does not matter whether the evidence in this case could support the "contrary decision" that Dr. Goldfarb's death was an accident. *Jett*, 890 F.2d at 1140. Reliance Standard's denial of the AD&D claim need only be supported by reasonable grounds to progress to the next step in our review. *See id.*; *Blankenship*, 644 F.3d at 1354–55. And we cannot say that Reliance Standard's conclusion—that a reasonable person, with similar characteristics to Dr. Goldfarb, would have expected injury or death as highly likely to occur on the climb up Pastore— is unsupported by reasonable grounds.

The Goldfarbs resist our conclusion that Reliance Standard's denial of AD&D benefits was supported by reasonable grounds with arguments about the parties' respective burdens of proof. They argue that Dr. Goldfarb's death must have been an accident, first, because Reliance Standard conceded that Dr. Goldfarb died and that the death was not a suicide and, second, because the policy contained no mountain-climbing exclusion. Even though

23-10309                    Opinion of the Court                    19

beneficiaries suing under 29 U.S.C. § 1132(a)(1)(B) bear the burden of proving their entitlement to benefits, *Horton*, 141 F.3d at 1040, based on these two things, the Goldfarbs argue that it was Reliance Standard's burden to prove that the death was not accidental.

First, they rely on *Horton*, which they say establishes a presumption that death was accidental when the cause of death cannot be determined. Oral Arg. 10:04–10:47, 11:06–11:27, 12:50–13:27. It falls on Reliance Standard, they argue, to rebut this presumption. *Id.* 11:18–11:19.

The Goldfarbs' interpretation of *Horton* misunderstands its presumptions. *Horton* did not shift the burdens of proof in accidental death cases; thus, the burden of proving accidental death remains with the Goldfarbs. And they have not carried this burden, especially given the deferential standard of review we must apply to Reliance Standard's decision.[3]

---

[3] The Goldfarbs advance another burden-shifting argument, that the burden of proof has shifted to Reliance Standard because on appeal the insurer invoked an exclusion in Dr. Goldfarb's policy to support its denial of AD&D benefits. This argument is slightly different from the ones discussed above because it does not rely on the *Horton* presumption against suicide. Instead, it relies on the rule that when an insurer invokes a specific policy exclusion to deny benefits, the insurer bears the burden to prove that the exclusion bars coverage. *Horton*, 141 F.3d at 1040. True, in its initial brief on appeal Reliance Standard posits that Dr. Goldfarb could have died of a heart attack or stroke on the mountain, instead of an accident. The Goldfarbs assert that Reliance Standard is relying on a policy exclusion because death or injury resulting from

In *Horton*, we reviewed a claim for ERISA benefits brought under 29 U.S.C. § 1132(a)(1)(B) by the widow of a man, Jacob Horton, who died in an "in-flight fire and airplane crash." 141 F.3d at 1040–41. Horton was insured under two insurance policies with accidental death coverage nearly identical to Dr. Goldfarb's. The policies included an exclusion for death by suicide. *Id.* "The evidence [was] inconclusive as to whether [Horton] died by accidental or intentional means," so the insurance companies argued that the death was not an accident, instead arguing that it was an "arson/suicide" and fell within the policy exclusion. *Id.* at 1040–42. We rejected this argument, concluding that it operated against common-law presumptions against suicide and in favor of accidental death. *Id.* at 1041–42. We thus affirmed the district court's conclusion that Horton's death was accidental.

The Goldfarbs read *Horton* to say that every death whose cause is inconclusive and that is not a suicide is automatically accidental, and the burden to prove suicide rests on the insurer. We disagree.

*Horton* applied a presumption against suicide only, in a case where the sole coverage question was whether Horton's death resulted from suicide or an accident. *See id.* at 1042 (affirming the

---

sickness or myocardial infarction are excluded from AD&D coverage. They are mistaken. Reliance Standard does not argue that any exclusion in Dr. Goldfarb's policy applies here. Instead, it advances the heart attack scenario as an illustration of the Goldfarbs' lack of evidence on the cause of Dr. Goldfarb's death. We reject this other burden-shifting argument as well.

district court's finding of insufficient evidence of suicide). When the "evidence is conflicting and nearly evenly balanced on whether the death was caused by suicide or accident," the presumption against suicide breaks the tie, favoring accident as the cause of death. *9A Couch on Insurance* § 138:66 (3d ed. 1997). But presuming the existence of an accident in all cases in which the insured did not commit suicide would "effectively create coverage by presumption," reversing the ordinary burdens of proof. *Id. Horton* did not create coverage by presumption. *See Horton*, 141 F.3d at 1040 (limiting holding to cases in which "the evidence is inconclusive as to whether the deceased died by accidental or intentional means"). It held the insured to its burden to prove entitlement to policy benefits. *Id.* (reiterating that a plaintiff suing under § 1132(a)(1)(B) "bears the burden of proving his entitlement to contractual benefits"). In affirming the district court's conclusion that the insurers failed to prove suicide and therefore that Horton's death was an accident, the Court determined only that the insurers failed to carry their traditional burden of proving an exclusion applied. *Id.*

*Horton* gives us no reason to shift the Goldfarbs' burden of proof in this case. They still must prove that Dr. Goldfarb's death was an accident to prove their entitlement to the AD&D benefit. *See id.* And no presumption against suicide applies here because Reliance Standard has conceded that Dr. Goldfarb did not commit suicide. So, the answer to whether Dr. Goldfarb's death was an accident does not turn on the suicide/accident dichotomy to which *Horton* applies.

Second, the Goldfarbs argue that the absence of a mountain-climbing exclusion in Dr. Goldfarb's policy means that his death while mountain climbing must have been an accident. We reject this argument. The lack of such an exclusion means only that Dr. Goldfarb's AD&D policy *could* have covered mountain climbing losses. Reliance Standard never argued otherwise. But the policy did not require Reliance Standard to cover all mountain climbing losses or to ignore the individual circumstances of a mountain climbing death. The Goldfarbs still bore the burden of proof to show that Dr. Goldfarb's death was an accident, even if he died while mountain climbing.

And the Goldfarbs have conceded that they cannot carry this burden because they admittedly cannot show that Dr. Goldfarb's death was an accident. They have stated, at multiple stages in this litigation, that "the evidence is inconclusive as to whether Dr. Goldfarb died by accidental means." Doc. 10 at 5; *see also* Oral Arg. 13:45–13:57 (agreeing that Dr. Goldfarb's cause of death was unknown and stating that he could have died of a heart attack). Indeed, the Goldfarbs' best guess as to cause of death—that he fell off Pastore Peak, perishing immediately or soon after the fall due to a lack of supplies and hostile weather conditions—was well within the scope of risk contemplated by Szlanko's warnings. It was, therefore, not arbitrary and capricious for the insurer to conclude that a reasonable mountain climber in similar circumstances would foresee this outcome as "highly likely to occur." *Wickman*, 908 F.2d at 1088. Even if such a fall occurred, Reliance Standard still

had reasonable grounds for deciding that Dr. Goldfarb's death was not an accident.

Considering the facts of Dr. Goldfarb's mountain climbing death through the lens of *Wickman*, we conclude that Reliance Standard's denial of the AD&D benefit was supported by reasonable grounds.

## B. Reliance Standard's Conflict of Interest Does Not Render its Denial of Benefits Arbitrary and Capricious.

Still, our analysis of whether the denial was arbitrary and capricious—and, therefore, whether Reliance Standard is entitled to summary judgment—is not yet complete. At step four, we must determine whether Reliance Standard operated under a conflict of interest in denying the claim. *Blankenship*, 644 F.3d at 1355. If a conflict of interest existed, at step six we account for the conflict as "merely . . . a factor" in determining whether the denial of the AD&D benefit was arbitrary and capricious. *Id.*

We have said that "[a] pertinent conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds." *Id.* This is known as a structural conflict of interest. *See id.* A structural conflict of interest existed in this case: under Dr. Goldfarb's insurance policy, it was up to Reliance Standard to determine the Goldfarbs' eligibility for the AD&D benefit, and, if they were eligible, Reliance Standard would pay the $500,000 out of its own funds.

We must account for this structural conflict of interest in our decision making, but we give it little weight. We have recognized that such structural conflicts are a common feature of ERISA plans, and their existence does not mean that we abandon all deference to the plan administrator's decision making. *Id.* at 1356. Our focus must remain on whether there was a reasonable basis for the benefits decision. *Id.* at 1355–56. The effect that a conflict of interest has on our analysis depends on "the severity of the conflict and the nature of the case: we look to the conflict's inherent or case-specific importance." *Id.* at 1355 (internal quotation marks omitted). The burden is on the Goldfarbs to show that self-interest tainted Reliance Standard's decision and rendered it arbitrary and capricious. *Id.*

The Goldfarbs have offered no evidence suggesting that Reliance Standard's structural conflict of interest had significant inherent or case-specific importance. Nor have they provided any evidence that the conflict influenced Reliance Standard's denial of their claim. So, we are left with the structural conflict standing alone. "The presence of a structural conflict of interest . . . constitutes no license, in itself, for a court to enforce its own preferred *de novo* ruling about a benefits decision." *Id.* at 1356. Thus, we conclude that Reliance Standard possessed a reasonable basis for its denial of the AD&D benefit and that its conflict of interest did not render the denial arbitrary and capricious. Because this is a conclusion of law, *id.* at 1354, Reliance Standard is entitled to summary

judgment on the Goldfarbs' § 1132(a)(1)(B) claim, and the summary judgment in the Goldfarbs' favor must be reversed.

## IV.    CONCLUSION

The district court's order granting the Goldfarbs' motion for summary judgment and denying Reliance Standard's cross motion for summary judgment is REVERSED. On remand, the district court is directed to enter judgment in Reliance Standard's favor.

**REVERSED and REMANDED**.