**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13443

_____

CHERIESE D. JOHNSON,

*Plaintiff-Appellant,*

*versus*

RELIANCE STANDARD LIFE INSURANCE COMPANY,

*Defendant-Appellee,*

THE WILLIAM CARTER COMPANY GROUP
LONG TERM DISABILITY INSURANCE PLAN,

*Defendant.*

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cv-02900-SDG

_____

Before WILLIAM PRYOR, Chief Judge, and GRANT and KIDD, Circuit
Judges.

GRANT, Circuit Judge:

Cheriese Johnson was not feeling well.  So she went to the doctor—many times—complaining of a wide variety of symptoms.  At these appointments, doctors diagnosed her with nearly a dozen ailments: fibromyalgia, borderline lupus erythematosus, and epistaxis, just to name a few.  What they did not diagnose was the disease she actually had—scleroderma, a rare autoimmune condition that causes hardening and thickening of the skin and other tissues.  No one had suspected this diagnosis before it happened.  And no one argues that the failure of diagnosis resulted from malpractice, bad faith, or evasion.

But when Johnson filed a scleroderma-based disability claim once she could no longer work, her insurance company denied it.  The problem, as the insurer saw it, was that many of Johnson's medical appointments took place during the three-month window before her policy went into effect.  Under Johnson's policy, disability benefits are not owed if they stem from "preexisting conditions" treated during that three-month lookback period.

This case hinges on the exact terms of that policy, which defined a preexisting condition as "any Sickness or Injury *for which* the Insured received medical Treatment, consultation, care or services, including diagnostic procedures, or took prescribed drugs or medicines."  *See* Reliance Standard Life Insurance Company Policy No. LTD 106119 (emphasis added).  The italicized phrase is key—"for which."  Johnson says she could not have received medical treatment *for* scleroderma during the lookback period because no one even suspected she had that condition until much

later. The insurance company takes a far broader view of the policy, and says no benefits are due if Johnson was treated for any symptoms during the lookback period that were *not inconsistent* with scleroderma—even if no one thought she had that condition or intended to treat it.

We agree with Johnson—the insurance company's interpretation is wrong. The closer question is whether its interpretation is also unreasonable, a heightened requirement of this Circuit's ERISA precedents. To be sure, the policy is likely susceptible to a multitude of reasonable readings. But we cannot conclude that the insurance company's, which would deny coverage for a brain tumor if the doctor encouraged a patient with headaches to drink more water, is one of them. We reverse and remand.

## I.

Cheriese Johnson began experiencing coughing and pain in her hands and feet in December 2015. Seven months later, in July 2016, she was hired to work in human resources at The William Carter Company, "the most trusted name in baby, kids, and toddler clothing." When she started the job, she bought a long-term disability insurance policy from Reliance Standard. The policy took effect on October 12, 2016.

By January 26, 2017—about four months after the policy kicked in—Johnson could no longer work. In insurance-speak, she was "totally disabled." But because that happened within one year of the date that she became insured, Johnson was subject to the

policy's "Pre-existing Conditions Limitation," which allowed Reliance Standard to deny benefits if her disability was "(1) caused by; (2) contributed to by; or (3) resulting from; a Pre-existing Condition." The policy went on to define "Pre-Existing Condition" as "any Sickness or Injury for which the Insured received medical Treatment, consultation, care or services, including diagnostic procedures, or took prescribed drugs or medicines," during the lookback period of the "three (3) months immediately prior to the Insured's effective date of insurance." All agree that the relevant "Sickness" here is scleroderma, and that the lookback period ran from July 12, 2016, through October 12, 2016.

Johnson did receive quite a bit of medical care during that time:

- On August 15, she was "seen in follow-up with assessments of fatigue, muscle weakness, nausea, and vomiting." The nurse practitioner continued her prescriptions for Cyclobenzaprine and Zofran.
- On August 23, she underwent an "upper gastrointestinal endoscopy," which revealed "gastritis and a hiatus hernia."
- On September 6, she was treated for "vomiting, nose bleeds, memory loss, body aches, and joint swelling." She was diagnosed with Helicobacter pylori, epistaxis, gastroesophageal reflux disease, edema, and hypertension, and she was given several prescriptions, none of which were for scleroderma.

- On September 13, she sought treatment for a "post-syncopal episode and low blood sugar." She was diagnosed with bronchitis, fatigue, gastroesophageal reflux disease, and sleep apnea.
- On September 30, she was treated for "numbness, coldness, and pain involving all four extremities, nausea, vomiting, forgetfulness, cognitive impairment, fatigue, inability to control bowels, blurred vision, fever, dropping things frequently, headaches, decreased appetite, syncope, dizziness, generalized aching, swelling of feet and hands, and loss of motor skills."

All told, Johnson presented over a dozen symptoms when she visited her many doctors. Most were garden-variety ailments:

- nausea
- vomiting
- cough
- fatigue
- swelling of feet and hands
- muscle weakness
- cognitive impairment
- Raynaud-type symptoms
- chronic pain
- gastroesophageal reflux disease
- hypertension
- decreased appetite

- syncope
- dizziness
- generalized aching
- a loss of motor skills.

These symptoms led to no fewer than ten diagnoses, none of which were scleroderma: (1) fibromyalgia; (2) borderline lupus erythematosus; (3) probable somatoform disorder; (4) helicobacter pylori; (5) epistaxis; (6) gastroesophageal reflux disease; (7) edema; (8) hypertension; (9) sleep apnea; and (10) bronchitis.

In February 2017—four months after the lookback period ended—Johnson underwent a lung biopsy to further investigate her symptoms. The biopsy led to a diagnosis of scleroderma, a "rare, chronic autoimmune disease in which normal tissue is replaced with dense, thick fibrous tissue." Symptoms typically include "joint pain and stiffness, persistent cough, shortness of breath, digestive and gastrointestinal problems, and fatigue." Neither Johnson nor any of her many doctors—a neurologist, pulmonologist, thoracic surgeon, and rheumatologist—ever suspected that she had scleroderma before the lung surgery.

Eight months later, Johnson filed a claim with Reliance Standard for long-term disability benefits stemming from her scleroderma symptoms. Denied. Johnson appealed that decision, arguing that because no one suspected that she had the disease until after the lookback period ended, it could not qualify as a preexisting condition. Though scleroderma is usually treated by rheumatologists because it is fundamentally an inflammatory

condition, Reliance Standard retained an endocrinologist—a doctor specializing in hormones—to review Johnson's file. The endocrinologist concluded that the "symptoms/findings do support a reported diagnosis of scleroderma." So Reliance Standard upheld the denial of Johnson's claim "on the basis that the claimed disability [was] caused by, contributed to by, or the result of a pre-existing condition"—namely, scleroderma.

Johnson sued Reliance Standard under the Employee Retirement Income Security Act of 1974 (ERISA), arguing that her long-term disability plan entitled her to benefits. She also filed a motion with the district court requesting judgment on the administrative record, while Reliance Standard moved for summary judgment. The district court denied her motion and granted summary judgment to Reliance Standard. Johnson now appeals.

## II.

We review a district court's ruling affirming or reversing a plan administrator's ERISA benefits decision de novo, "applying the same legal standards that governed the district court's decision." *Goldfarb v. Reliance Standard Life Ins. Co.*, 106 F.4th 1100, 1105 (11th Cir. 2024) (quotation omitted).

## III.

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). The statute was enacted to "promote the interests of employees and their beneficiaries in

employee benefit plans, and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (quotations and citation omitted).  To implement those goals, "federal courts have developed a body of federal common law to govern the review, interpretation, and enforcement of ERISA benefits plans." *Goldfarb*, 106 F.4th at 1105.  That includes distinct burdens of proof.  For example, when "the insurer claims that a specific policy exclusion applies to deny the insured benefits"—the situation we have here—the burden falls on the insurer, who "generally must prove the exclusion prevents coverage." *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998).  And this Circuit adds a six-step sequence governing review of a plan administrator's benefits decision:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds

23-13443                Opinion of the Court                9

supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011).

We stand alone in applying this framework.[1] *See* J. Christopher Collins et al., *ERISA Survey of Federal Circuits* 15–17; 78–80; 153–57; 222–26; 295–301; 355–57; 412–16; 449–53; 505–09; 594–602; 660–63; 738–45 (Brooks R. Magratten ed. 2024)

---

[1] More typical is the approach of six of our sister circuits, each of which simply applies the classic arbitrary-and-capricious test if the plan administrator is vested with discretion. *See Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan*, 705 F.3d 58, 61 (1st Cir. 2013); *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995); *Dowling v. Pension Plan for Salaried Emps. of Union Pac. Corp. & Affiliates*, 871 F.3d 239, 245–46 (3d Cir. 2017); *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006); *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010); *Chambers v. Fam. Health Plan Corp.*, 100 F.3d 818, 825 & n.1 (10th Cir. 1996).

(describing each circuit's approach). And candidly, while this six-step dance is likely unnecessarily complex (and may even obscure the lawful result in certain cases), we apply it all the same because it is our binding precedent. *See In re Lambrix*, 776 F.3d 789, 794 (11th Cir. 2015).

Here, the answers at steps one and two are relatively straightforward: Reliance Standard's decision is de novo wrong and the company plainly has interpretive authority. But our analysis ends after step three because Reliance Standard's interpretation of the policy is not only de novo wrong, it is also unreasonable: it overlooks the distinction between receiving medical care for symptoms that are not inconsistent with a preexisting condition and receiving medical care for the preexisting condition itself. *See Blankenship*, 644 F.3d at 1355.

## A.

At step one, we apply "ERISA's common law" and consider whether Reliance Standard's benefits-denial decision was wrong. *See Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1234–35 (11th Cir. 2006) (quotation omitted); *Blankenship*, 644 F.3d at 1355. The answer to that question depends on whether the company correctly interpreted the terms of Johnson's disability policy. It did not.

As always, we begin with "the plain and ordinary meaning of the policy terms to interpret the contract." *Alexandra H. v. Oxford Health Ins. Freedom Access Plan*, 833 F.3d 1299, 1307 (11th Cir. 2016). Johnson's policy states that benefits "will not be paid" for a

disability that is "caused by," "contributed to by," or "resulting from" a preexisting condition. Here, a preexisting condition is any illness "*for which* the Insured received medical Treatment, consultation, care or services, including diagnostic procedures, or took prescribed drugs or medicines" during the lookback period. *See* Reliance Standard Life Insurance Company Policy No. LTD 106119 (emphasis added). In plain speak: the preexisting condition exclusion is triggered when someone receives medical treatment "for" a "Sickness or Injury" during the lookback period.

A lot hinges on *for*—a word that "connotes intent." *Lawson ex rel. Lawson v. Fortis Ins. Co.*, 301 F.3d 159, 165 (3d Cir. 2002) (Alito, J.). That word is used "to indicate the object, aim, or purpose of an action or activity." *See For*, The American Heritage Dictionary of the English Language (5th ed. 2016); *see also For*, Webster's Ninth New Collegiate Dictionary (1986) ("for" is "used as a function word to indicate purpose"). As Black's Law Dictionary puts it: the word *for* "connotes the end with reference to which anything is, acts, serves, or is done." *For*, Black's Law Dictionary (5th ed. 1979). Or: "In consideration of which, in view of which, or with reference to which, anything is done or takes place." *Id.* Texts using the word *for*, then, have "an implicit intent requirement" baked into them. *Lawson*, 301 F.3d at 165.

Applying that meaning to Johnson's case, we have little difficulty concluding that Reliance Standard's benefit-denial decision was wrong. No one "intended or even thought" to treat Johnson "for" scleroderma during the lookback period. *See id.* And

as then-Judge Alito explained, "it is hard to see how a doctor can provide treatment 'for' a condition without knowing what that condition is or that it even exists." *Id.* Because neither Johnson "nor her physicians either knew or suspected that the symptoms she was experiencing were in any way connected with" scleroderma, it would make little sense to say that she was treated *for* scleroderma. *McLeod v. Hartford Life & Accident Ins. Co.*, 372 F.3d 618, 620 (3d Cir. 2004). Simply put: giving the language in Johnson's policy its "ordinary and popular" meaning requires us to conclude that she is entitled to benefits. *See Pitcher v. Principal Mut. Life Ins. Co.*, 93 F.3d 407, 411 (7th Cir. 1996) (quotation omitted).

We reach this conclusion without a thumb on the scale in Johnson's favor. To be sure, part of the federal common law for ERISA is that "the rule of *contra proferentem* requires us to construe any ambiguities against the drafter." *Alexandra H.*, 833 F.3d at 1307. But we invoke this interpretive canon only when "a term is ambiguous" and both sides advance "reasonable interpretations that can be fairly made." *Id.* Because Reliance Standard's interpretation falls far short, we see no need to resort to contra proferentem to buttress our straightforward conclusion. *See Pitcher*, 93 F.3d at 412, 418 (contra proferentem unnecessary to conclude that plaintiff was not treated "for" cancer when neither she "nor her physician, at this juncture, had reason to suspect that" she had it).

In short: because scleroderma was not a condition for which Johnson received medical treatment during the lookback period, Reliance Standard was wrong to deny coverage.

**B.**

So we move on to step two, asking whether the policy vested Reliance Standard "with discretion in reviewing claims." *See Blankenship*, 644 F.3d at 1355. The policy must "expressly" give Reliance Standard "discretionary authority to make eligibility determinations or to construe the plan's terms." *Kirwan v. Marriott Corp.*, 10 F.3d 784, 788 (11th Cir. 1994) (emphasis omitted). That standard is high, but here the question is not close. Johnson's policy states that Reliance Standard "has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits." We thus continue on our six-step journey.

**C.**

Step three, often the heart of the ERISA analysis in this Circuit, is decisive here too. Even though Reliance Standard's decision was wrong, because the firm was vested with discretion in reviewing claims, we protect that discretion by evaluating whether "reasonable" grounds supported its decision. *See Blankenship*, 644 F.3d at 1355. That means we review Reliance Standard's decision

"under the more deferential arbitrary and capricious standard."[2] *Id.*

Make no mistake: this standard really is deferential. So long as a reasonable basis for denying coverage exists, the administrator's decision "must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision." *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1140 (11th Cir. 1989). As a leading treatise explains, we cannot substitute our own judgment for that of the fiduciary. *See* 1A Steven Plitt et al., *Couch on Insurance* § 7:60 (3d ed. 2023).

Still, "deferential review is not no review," and "deference need not be abject." *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (alteration adopted and quotation omitted). There will be times when "the plain language or structure of the plan or simple common sense will require the court to pronounce an administrator's determination arbitrary and capricious." *Id.* This is one of those times.

Reliance Standard's interpretation of the preexisting condition language as applied to Johnson's claim is unreasonable because it completely elides the distinction between receiving medical care for symptoms not inconsistent with a preexisting condition and receiving medical care for a preexisting condition itself. Reliance Standard agrees that its interpretation of the plan

---

[2] In this context, there is "no substantive distinction between the terms 'arbitrary and capricious' and 'abuse of discretion.'" *Shaw v. Conn. Gen. Life Ins. Co.*, 353 F.3d 1276, 1284–85 n.7 (11th Cir. 2003) (quotation omitted).

means that "any symptom experienced" before the ultimate diagnosis would allow the company to deny coverage "so long as the symptom was not later deemed inconsistent with that condition." *McLeod*, 372 F.3d at 625 (rejecting this view). It is no exaggeration to say that under Reliance Standard's view, a patient told to drink more water because her headache was likely caused by her dehydration has been treated *for* cancer if she turns out to have a brain tumor. And that is true even if dehydration really was the root cause of the headache. Headaches, after all, are a symptom of both brain tumors and dehydration. So, to Reliance Standard, treatment for a headache during the lookback period converts any disease or condition that causes headaches into a preexisting condition under the policy. We do not overstate the company's view—Reliance Standard doubled down on it at oral argument.[3]

This position is unreasonable—full stop. It "interprets the plan in a manner inconsistent with its plain words," which speak in terms of an "illness or disease," not a symptom theoretically consistent with having an illness or disease. *See McCauley v. First*

---

[3] This point alone refutes the suggestion that we are "attacking a strawman." Dissenting Op. at 7. No. We are taking Reliance Standard at its word. In fact, the dissent outright embraces this interpretation, positing that a football player who undergoes concussion protocols has received medical care "for" cancer if a CT scan happens to reveal an unsuspected brain tumor. *Id*. at 5. Under the dissent's logic, the football player is also out of luck if medical staff told him to drink more water to rehydrate after a long match. *McLeod* rejected this exact interpretation. *See* 372 F.3d at 625.

*Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008) (quotation omitted). Even *Bullwinkel v. New England Mutual Life Insurance*—Reliance Standard's best case—rejected this cramped interpretation. 18 F.3d 429 (7th Cir. 1994). As the Seventh Circuit explained, a person does not have a preexisting condition merely because he purchased generic cough medicine in one month and learned about his lung cancer in the next. *Id.* at 433.

To be sure, Reliance Standard is right that Johnson presented many symptoms to her doctors during the lookback period, some of which were not inconsistent with scleroderma.[4] But recall that these symptoms—things like nausea, vomiting, cough, fatigue, and swelling—were vague and general, pointing to any variety of other ailments. And though Johnson received no fewer than ten diagnoses, scleroderma was conspicuously absent from the list. Indeed, "none of the tests" Johnson underwent during this process "ever linked the symptoms she was experiencing" to scleroderma, so doctors had no suspicion that she might have it. *See McLeod*, 372 F.3d at 628. And that means there could be no "intention" on the part of Johnson's doctors to treat her *for* scleroderma. *Id.* None. Put another way: because there is "no evidence that the possibility that" Johnson had scleroderma "ever entered the minds of" Johnson's doctors, "it would not make sense" to say that she

---

[4] Curiously, Reliance Standard's denial letters never specified *which* of Johnson's symptoms were theoretically consistent with scleroderma. But Johnson does not dispute that at least one of them was.

23-13443             Opinion of the Court                    17

received medical advice or treatment for scleroderma.[5] *Lawson*, 301 F.3d at 166.

To illustrate, suppose an insured goes to his doctor during the lookback period complaining of coughing and fatigue. Seeing and suspecting nothing grievously wrong, the doctor diagnoses him with the flu and prescribes Nyquil. But a month later—after the lookback period has ended—he starts coughing up blood and is soon diagnosed with tuberculosis. Did the doctor treat the patient *for* tuberculosis a month earlier? Of course not. And we cannot see how it would be reasonable to say yes. Yet under Reliance Standard's reading of the policy, it could (would) deny benefits because the coughing and fatigue were symptoms *not inconsistent with* the unsuspected tuberculosis—rendering the tuberculosis a preexisting condition and counting the Nyquil as a treatment *for* the unsuspected tuberculosis.[6]

This sweeping interpretation of "for" is outside the bounds of reasonableness. The problem with Reliance Standard's "ex post

---

[5] We also note that all evidence points to consistent good-faith efforts by Johnson to get a diagnosis.

[6] Recasting Reliance Standard's argument, the dissent insists that "there is more than 'consistency' between what Johnson was treated for and scleroderma; they are the same thing." Dissenting Op. at 8. If that's the argument, we are not sure what to make of it. Even though Johnson received treatment for fatigue, nausea, and other symptoms that *can be* consistent with scleroderma, the symptoms are not the disease—an indication of something is not the thing itself. In fact, it is hard to find a condition for which fatigue is *not* a symptom. So it makes no sense to say that fatigue is "the same thing" as

facto analysis is that a whole host of symptoms occurring before a 'correct' diagnosis is rendered, or even suspected, can presumably be tied to the condition once it has been diagnosed." *McLeod*, 372 F.3d at 625. And, again, that's true even if the earlier symptom is not ultimately connected to the eventual diagnosis. Indeed, under Reliance Standard's view, "any time a policy holder seeks medical care of any kind during the look-back period, the 'symptom' that prompted him to seek the care could potentially be deemed a symptom of a pre-existing condition, as long as it was later deemed consistent with symptoms generally associated with the condition eventually diagnosed." *Id.*

That view is arbitrary and capricious. As then-Judge Alito explained, "considering treatment for symptoms of a not-yet-diagnosed condition as equivalent to treatment of the underlying condition ultimately diagnosed might open the door for insurance companies to deny coverage for any condition the symptoms of which were treated during the exclusionary period." *Lawson*, 301 F.3d at 166. Here, that "might" becomes a "would." *See id.* And to bless "such backward-looking reinterpretation of symptoms to support claims denials would so greatly expand the definition of preexisting condition as to make that term meaningless: any prior symptom not inconsistent with the ultimate diagnosis would provide a basis for denial." *Id.* (quotation omitted). Other courts agree. *See, e.g.*, *McLeod*, 372 F.3d at 628; *Est. of Ermenc ex rel. Ermenc*

---

scleroderma or coughing is "the same thing" as tuberculosis, any more than to say that a wet umbrella is "the same thing" as a hurricane.

*v. Am. Fam. Mut. Ins. Co.*, 585 N.W.2d 679, 682 (Wis. Ct. App. 1998); *Karagon v. Aetna Life Ins. Co.*, 228 N.W.2d 515, 516 (Mich. Ct. App. 1975).

In the end, Reliance Standard urges us to apply a different policy than the one it wrote, reading it as if it barred coverage for claims arising from conditions that may have *originated* or *existed* during the lookback period, not conditions that were treated during that period. And its reading may be even broader than that—denying coverage based on symptoms that occurred during the lookback period, whether or not those symptoms were connected to the eventual disability claim. So despite our deferential posture, we decline the invitation to stretch the text of Johnson's policy beyond what it can reasonably bear.

Reliance Standard's counterarguments do not persuade. The company chiefly relies on this Court's unpublished decision in *Ferrizzi v. Reliance Standard Life Insurance*, 792 F. App'x 678 (11th Cir. 2019) (unpublished). We start by pointing out that unpublished cases are not precedential and do not bind us. *See Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1195 (11th Cir. 2025). But even putting that aside, *Ferrizzi* does not move the needle.

That panel dealt with a nearly identical disability policy to the one we have here. *See Ferrizzi*, 792 F. App'x at 684. The question was whether "substance abuse/drug dependency" was a condition "for which" the claimant received medical treatment during the lookback period. *Id.* The plaintiff said no, asserting that he was neither diagnosed with nor treated for this illness during

20                    Opinion of the Court                    23-13443

that time.  *See id.*  This Court rejected that argument with little analysis, concluding that the policy at issue did not "require a formal diagnosis during the lookback period."  *Id.* at 685.  That's it.

We do not find *Ferrizzi* instructive.  For one, Johnson, unlike Ferrizzi, does not say that there must be a "formal diagnosis" during the lookback period.  *See id.* at 684–85.  Nor do we—suspecting and treating for a condition is enough.  And the doctors in *Ferrizzi did* suspect that he had a substance-dependency illness during the lookback period.  *Id.* at 685.  Indeed, Ferrizzi "received 'medical treatment' for substance abuse/drug dependency on at least one occasion during the lookback period."  *Id.*  Not so for Johnson.  *Ferrizzi* is entirely consistent with our holding here, and we do not understand the dissent's insistence that it is not.[7]  *See* Dissenting Op. at 6–7.

---

[7] Nor do the dissenting opinion's comparator cases make the point the opinion suggests.  Most obvious is *Mogil v. California Physicians Corp.*,  267 Cal. Rptr. 487, 492 (Cal. Ct. App. 1990).  The policy at issue there defined "Pre-existing Condition" to exist where: (i) "any professional advice or treatment of a Physician, or any medical supply (including but not limited to prescription drugs or medicines) was obtained for that Disability" *or* (ii) "the Disability was manifest to the Covered Person."  *Id.* at 488 (emphasis added).  The court's decision turned on (ii), not (i): the insured's treatment was not covered because her cancer "manifested" itself prior to the policy's start date.  *See id.* at 491–94.  The policy here has no such provision.  Likewise, *Lincoln Income Life Insurance v. Milton* involved an exclusion that barred coverage where the insured's disease "first commenced or became evident after the effective date of the contract."  412 S.W.2d 291, 292 (Ark. 1967).  And the policy in *Kirchstein v. Kentucky Central Life Insurance* defined "sickness" broadly—to include "all complications arising therefrom or reoccurrences thereof."  556 So. 2d 1190,

23-13443                Opinion of the Court                21

Reliance Standard's emphasis on the Seventh Circuit's *Bullwinkel* decision is similarly misplaced. 18 F.3d 429. There, the plaintiff went to her doctor during the lookback period because of a lump on her breast. *Id.* at 430. The doctor was "concerned about the possibility of cancer" and referred her to a surgeon. *Id.* After the lookback period ended, a surgeon completed a biopsy on the lump and confirmed that it was cancerous. *Id.* The plaintiff sought treatment, but the insurance company denied coverage, classifying the cancer as a preexisting condition. *Id.* The Seventh Circuit agreed: because the "lump was discovered in September to be cancerous," it took "from this fact that the lump was also cancerous in July," during the lookback period when her physician suspected that disease. *Id.* at 432. In so concluding, the panel emphasized that the plaintiff's symptoms "were not trivial and inconclusive—like a cough or a rash which might imply any of a variety of maladies." *Id.* Her doctor was concerned about cancer, and that made the difference.[8]

---

1192 (Fla. Dist. Ct. App. 1990). Johnson's policy lacks the symptoms-focused exclusions discussed in *Mogil*, *Milton*, and *Kirchstein*. These cases interpreting different policy language do not control here, and we cannot rewrite her policy to say what it does not.

[8] The Seventh Circuit itself has been clear that *Bullwinkel* did not go nearly as far as Reliance Standard suggests: *Bullwinkel* depended on its facts, and "was obviously not intended as an authorization for summary judgment in favor of insurers in all future cases dealing with pre-existing condition limitations." *Pitcher*, 93 F.3d at 416 (alteration adopted and quotation omitted).

22                    Opinion of the Court                    23-13443

This case is worlds apart.  It involves a patient who exhibited "only non-specific symptoms and neither the patient nor the physician" suspected that the later-diagnosed illness was in play. *Lawson*, 301 F.3d at 166.  To be sure, when a patient "seeks advice for a sickness with a specific concern in mind"—like the breast lump in *Bullwinkel*—"an intent to seek or provide treatment or advice 'for' a particular disease has been manifested."  *Id.*; *see also Marshall v. UNUM Life Ins. Co.*, 13 F.3d 282, 283 (8th Cir. 1994) (chronic fatigue syndrome was a preexisting condition when plaintiff "sought treatment for chronic fatigue" during the lookback period).  But where, as here, the doctor "had no reason to suspect, much less believe, that his patient was afflicted" with a later-diagnosed condition, the patient did not receive treatment "for" it.[9]  *Pitcher*, 93 F.3d at 415–16.

That's also why the dissent's interpretation fails.  To start, it is not the one pressed by Reliance Standard.  Plus, the dissent puts too much weight on the words "diagnostic procedures," which are completely consistent with our interpretation of the policy.  *See* Dissenting Op. at 4–5.  The policy makes clear that diagnostic

---

[9] The other cases in the dissent's page-long string cite offer little in the way of support.  *See* Dissenting Op. at 8–9.  One involved a patient who exhibited "strong indications" of a particular illness.  *See LoCoco v. Med. Sav. Ins. Co.*, 530 F.3d 442, 448 (6th Cir. 2008).  Another involved a patient whose doctor had "reasonable cause to believe that [he] had multiple sclerosis."  *Dowdall v. Com. Travelers Mut. Accident Ass'n of Am.*, 181 N.E.2d 594, 595 (Mass. 1962).  In these cases, the insured's sickness manifested in the form of "a distinct symptom or condition from which one learned in medicine can diagnose the disease."  *Id.* at 596.  The same cannot be said for Johnson.

procedures "for" a particular disease trigger the policy's preexisting conditions exclusion. So if a doctor who suspects cancer performs a biopsy—a diagnostic procedure "for" cancer—that procedure counts under this contract. But a doctor who suspects nothing in particular cannot perform a procedure "for" a specific condition. The "interpretive problem" the dissent identifies is thus one of its own making. *See id.* at 5.

It would be "awkward at best" to say that Johnson "received treatment" *for* scleroderma because "there is no connection between the treatment or advice received and the sickness." *Lawson*, 301 F.3d at 166. We reject this unnatural reading of her policy. So despite our deferential standard of review, we conclude that Reliance Standard's denial of benefits was arbitrary and capricious because its interpretation was "contrary to the clear language of the plan." *See Lockhart v. United Mine Workers of Am. 1974 Pension Tr.*, 5 F.3d 74, 78 (4th Cir. 1993) (alteration adopted and quotation omitted); *McLeod*, 372 F.3d at 628 (district court "erred as a matter of law" when it misread clear policy language).

★      ★      ★

We emphasize again that we are not charged with finding the best interpretation of Johnson's policy. There are likely a range of reasonable interpretations; it's just that Reliance Standard's is not one of them. It warps the "plain and ordinary meaning" of the policy language, converting a preexisting-condition exclusion into a preexisting-symptom exclusion. *Alexandra H.*, 833 F.3d at 1307. The company's reading of the plan was arbitrary and capricious, so

we **REVERSE** the district court's grant of summary judgment for Reliance Standard and **REMAND** for further proceedings consistent with this opinion.

23-13443          WILLIAM PRYOR, C.J., Dissenting          1

WILLIAM PRYOR, Chief Judge, Dissenting:

As far back as the record reflects, Cheriese Johnson has experienced several ailments and symptoms. Since October 2015, she has suffered from joint pain and swelling, shortness of breath, fatigue, chronic vomiting, gastroesophageal reflux, and coughing—to name a few. She regularly sought treatment for those symptoms with various health specialists and was prescribed several medications for them. Later, in October 2016, Johnson became insured for disability under a policy administered by Reliance Standard Life Insurance Company. Unfortunately, Johnson's symptoms did not disappear after she became insured—they only progressed. In October 2017, Johnson filed a claim with Reliance for disability based on the symptoms she had experienced for two years. In the claim form, Johnson's physician stated that those symptoms were the result of scleroderma—a sickness that had gone undiagnosed until four months after the policy's lookback period ended but that involves the very symptoms he had treated every few months since April 2016, well before the lookback period. Reliance denied Johnson's claim because, as her physician admitted, she had suffered from and was treated for the symptoms of scleroderma long before she became covered. Under the policy, Johnson could not receive benefits for a "Pre-existing Condition." Yet, the majority holds that Reliance *unreasonably* found that Johnson's scleroderma was a pre-existing condition. It does so by ignoring the whole text of Johnson's policy, the record facts, and the settled purpose of pre-existing condition exclusions, and it dismisses as unreasoned our earlier

2                    WILLIAM PRYOR, C.J., Dissenting            23-13443

decision interpreting the same policy to require the opposite result. I respectfully dissent.

As always, when reviewing an administrator's interpretation of a policy, we begin with "the plain and ordinary meaning of the policy terms." *Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1307 (11th Cir. 2016). The policy excludes coverage for benefits "caused by," "contributed to by," or "resulting from" a "Pre-Existing Condition." And it defines "Pre-Existing Condition" as any sickness or injury "for which the Insured received medical Treatment, consultation, care or services, including diagnostic procedures, or took prescribed drugs or medicines" during the lookback period.

The majority isolates a single word in the exclusion to determine its entire scope: "for." Majority Op. at 11–12. Even at a bird's eye view, it is strange for the majority to base its entire textual analysis on a single word that has, at least, *eleven* different definitions. *See For*, WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1959); *For*, OXFORD ENGLISH DICTIONARY (revised 2022). It is even stranger, as the majority does, to take one meaning of the word "for" as determinative and not even consider whether that meaning, or an alternative one, makes more sense in context. When considering "possible meanings that a word . . . can bear," a "judicial interpreter [should] consider the *entire text*, in view of its structure and of the physical and logical relation of its many parts." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 24, at 167–68 (2012) (emphasis added). And

23-13443          WILLIAM PRYOR, C.J., Dissenting          3

"[p]articularly when interpreting" a text that "features as elastic a word" as *for*, we "construe [the text's] language in its context and in light of the terms surrounding it." *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004).

The majority attempts to make up for its interpretive myopia through name dropping by relying heavily on a sister circuit precedent involving a current Supreme Court Justice's earlier interpretation of the word "for" in a materially different policy. Then-Judge Alito's (whom the majority references three times by name) opinion in *Lawson ex rel. Lawson v. Fortis Insurance Co.* read "for" as a term that "connotes intent." 301 F.3d 159, 165 (3d Cir. 2002). The majority reasons that because none of Johnson's doctors "intended or even thought" to treat scleroderma by name, they could not have treated Johnson "for" scleroderma during the lookback period. Majority Op. at 11.

But this appeal is not so easy. The Reliance exclusion, read in context, cannot bear the intent-based meaning of "for" on which the majority rests its decision. Instead, "for" is read more naturally in the exclusion as meaning "because of." *See For,* WEBSTER'S SECOND, *supra* (number seven); *For,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993) (number eight); *For,* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2022) (number seven); *For,* OXFORD ENGLISH DICTIONARY, *supra* (number seven). To be sure, "for" can be read as meaning "intended" in some parts of the exclusion. To take the majority's example, it makes sense to say a sickness that doctors intended to

treat during the lookback period is a pre-existing condition. *See* Majority Op. at 12. Yet, in the context of other parts of the exclusion, it makes little sense to read "for" as having an "implicit intent requirement." *Lawson*, 301 F.3d at 165.

For example, under the majority's view, a "diagnostic procedure" must have been *intended* for a particular condition for the diagnostic procedure to trigger the exclusion. But a doctor does not perform a diagnostic procedure if he already knows what the diagnosis is. And in some cases, contrary to the majority, a diagnostic procedure may point a doctor to a condition he never "suspected" or "even thought" of before the procedure. *See* Majority Op. at 22; *see also id*. at 11.

By its plain meaning, a procedure is "diagnostic" when it "serv[es] to distinguish, identify, or determine," *Diagnostic*, WEBSTER'S THIRD, or to "[i]ndicat[e] the nature of a disease," *Diagnostic*, WEBSTER'S SECOND. Nothing in that definition suggests that a diagnostic procedure ceases being "diagnostic" if it "identif[ies]" or "indicat[es]" an unsuspected condition. On the contrary, doctors learn to expect unsuspected findings. As one medical textbook explains, "[i]n many cases, diagnostic testing can identify a condition before it is clinically apparent"—much less, one "clinically apparent" by its symptoms but unsuspected by name until the procedure. ERIN P. BALOGH ET AL., IMPROVING DIAGNOSIS IN HEALTH CARE 39 (2015). We recognized this common-sense medical reality in an unpublished decision when we said "[a]lthough doctors assign a 'diagnostic conclusion' to a known condition, they order

23-13443          WILLIAM PRYOR, C.J., Dissenting          5

'diagnostic procedure' for unknown ones." *Jones v. Golden Rule Ins. Co.*, 748 Fed. App'x 861, 867 (11th Cir. Aug. 23, 2018).

For example, imagine a doctor performs a CT scan thinking that his patient's severe headaches are symptoms of a concussion sustained during a football game. *See Concussion*, MAYO CLINIC, https://perma.cc/8LTG-2P5H (noting that a "[CT] scan of the head is the standard test in adults to assess the brain right after injury"). During the CT scan, the doctor detects a cancerous tumor he determines to be the cause of the headaches. *See Brain tumor*, MAYO CLINIC, https://perma.cc/W7EB-VJW2 (noting that a "CT scan [may] show[] a brain tumor"). Although the doctor did not intend to diagnose or suspect brain cancer, he performed the brain scan "because of" it. After all, the tumor was the cause of the headaches.

That *Lawson*'s definition of "for" cannot be superimposed on Johnson's policy should be no surprise. The policy in *Lawson* did not reference "diagnostic procedures," *see* 301 F.3d at 161, and if it had, the Third Circuit might have adopted a different interpretation, *cf. LoCoco v. Med. Savs. Ins. Co.*, 530 F.3d 442, 446–47 (6th Cir. 2008) (holding that *Lawson*'s intent-based definition of "for" did not "extend to the particular contractual language at issue," because the language in the provision excluded sicknesses "for which . . . diagnosis . . . was recommended").

Reading "for" as "because of" avoids this interpretive problem. A doctor can perform diagnostic procedures "because of" the underlying symptoms of scleroderma, even if he does not know or

6                WILLIAM PRYOR, C.J., Dissenting            23-13443

even suspect that the patient's symptoms are attributable to sclero-derma. Indeed, it happened here. Johnson underwent a "diagnostic procedure"—an upper gastrointestinal endoscopy—*because of* gas-trointestinal symptoms that are also symptoms of scleroderma. This reading comports with the rest of the pre-existing condition exclusion. Under this definition, the policy excludes coverage for any sickness or injury "[because of] which [Johnson] received med-ical Treatment, consultation, care or services, including diagnostic procedures, or took prescribed drugs or medicines" during the lookback period.

Inconveniently for the majority, our Court interpreted the same provision of the same policy in *Ferrizzi v. Reliance Standard Life Insurance Company*—yes, *that* Reliance Standard Life Insurance Company—and came to the opposite conclusion as the majority in a routine unpublished opinion several years ago. 792 F. App'x 678, 680 (11th Cir. Nov. 7, 2019). As the majority admits, *Ferrizzi* held that the "Reliance policy exclusion does not require a formal diag-nosis during the lookback period" for the exclusion to apply. *Id*. at 685. Contrary to the majority's gloss, *see* Majority Op. at 20, neither did *Ferrizzi require* that the excludable sickness be "suspected" by healthcare professionals during the lookback period. After all, the text of the exclusion never requires that doctors "suspect" a partic-ular sickness for it to be excludable. The *Ferrizzi* court instead af-firmed Reliance's denial of benefits by determining that the in-sured's condition pre-existed the policy as a matter of fact and that he "received medical treatment" for a symptom of that condition. *Id*. (internal quotation marks omitted). Yet, our interpretation of

23-13443          WILLIAM PRYOR, C.J., Dissenting          7

the same exclusion was, under the majority's position, "arbitrary and capricious" and "unreasonable—full stop." Majority Op. at 15, 18. But as the district court reasoned, "[a]t a minimum," Reliance's adoption of the interpretation in *Ferrizzi* "demonstrate[s] that [Reliance's determination] was *not unreasonable*."

Instead of engaging seriously with the whole text of the exclusion, the majority ascribes to Reliance a position that it never takes—attacking a strawman. According to the majority, Reliance argues that "no benefits are due if Johnson was treated for any symptoms during the lookback period that were *not inconsistent* with scleroderma." Majority Op. at 3. This assertion does not appear in Reliance's brief nor was it uttered by Reliance's counsel at oral argument (even if he inartfully answered a broad hypothetical). The majority took this argument from a quotation in the Third Circuit's decision in *McLeod v. Hartford Life and Accident Insurance Co.*, imputed it to Reliance, and rejected it as the Third Circuit did. *See id*. at 15 (quoting 372 F.3d 618, 625 (3d Cir. 2004)).

But Reliance's argument is not so broad. In its brief, Reliance instead argues that healthcare professionals treated Johnson's scleroderma during the lookback period because the "record[] indisputably establish[es] that she received treatment, consultation[,] and medication during the look back period for the very conditions and symptoms" that prove that she suffers from scleroderma. To establish that, it points out that doctors treated and prescribed medication for the "various symptoms and conditions of scleroderma" she experienced during the lookback period. In other words,

8                 WILLIAM PRYOR, C.J., Dissenting          23-13443

Reliance asserts there is more than "consistency" between what Johnson was treated for and scleroderma; they are the same thing. To borrow the majority's metaphor, *see* Majority Opinion at 17 n.6, it is like using an umbrella to stay dry without knowing whether the current rainstorm is a hurricane or quick summer shower. In either case, the umbrella fends off the rains. So too doctors treated Johnson's symptoms of scleroderma without knowing scleroderma was their cause.

It is hardly novel that the terms of a pre-existing condition exclusion may bar coverage for a sickness that went undiagnosed or unsuspected by name during the lookback period. *See, e.g.*, *Hughes v. Bos. Mut. Life Ins. Co.*, 26 F.3d 264, 266, 269 (1st Cir. 1994) (concluding that a similar provision could be "reasonabl[y] inter-pret[ed]" to mean that a "treatment 'for' a condition refers to treat-ment of any symptom which in hindsight appears to be a manifes-tation of the condition"); *LoCoco*, 530 F.3d at 447 ("[I]f receipt of a recommendation to undergo a diagnostic process is sufficient to render a condition 'pre-existing,' as the language of the contract in this case states, it cannot be that an actual diagnostic conclusion is required." (footnote omitted)); *Bullwinkel v. New England Mut. Life Ins. Co.*, 18 F.3d 429, 430–32 (7th Cir. 1994) (excluding cancer as a pre-existing condition because "even though [the insured] did not know [her symptom] was cancerous . . . , her visit with the doctor" during the lookback period "concerning [the symptom] actually concerned cancer"); *Marshall v. UNUM Life Ins. Co.*, 13 F.3d 282, 285 (8th Cir. 1994) (explaining that although the insured's "physicians may have had difficulty identifying her condition" during the

23-13443          WILLIAM PRYOR, C.J., Dissenting          9

lookback period, the court "need[s] only decide whether her disabling condition is linked to her pre-existing condition"); *Lincoln Income Life Ins. Co. v. Milton*, 412 S.W.2d 291, 292 (Ark. 1967) ("That [the insured] did not know the medical explanation for her condition when she applied for the policy is not a reason for holding that the condition [was not pre-existing]."); *Mogil v. Cal. Physicians Corp.*, 267 Cal. Rptr. 487, 492 (Cal. Ct. App. 1990) (concluding that pre-existing conditions were excludable if they were "manifest" during a lookback period and defining manifest as "that point in time when the sickness or disease becomes symptomatic and not necessarily when the exact nature of sickness or disease is diagnosed by a physician" (alterations adopted) (citation and internal quotation marks omitted)); *Kirchstein v. Ky. Cent. Life Ins. Co.*, 556 So. 2d 1190, 1192 (Fla. Dist. Ct. App. 1990) ("That the doctor may have incorrectly diagnosed the 'sickness' does not change the fact that the condition for which she received treatment was a preexisting condition under the terms of this policy . . . ."); *Dowdall v. Com. Travelers Mut. Acc. Ass'n of Am.*, 181 N.E.2d 594, 596 (Mass. 1962) (holding that for the exclusion to apply, "[k]nowledge of the existence of the disease on the part of the plaintiff was not required; it was sufficient if the disease had in fact originated prior to the effective date of the policy"). Although these decisions do not bear on our interpretation of the policy in this appeal, they confirm that pre-existing conditions exclusions do not ordinarily turn on whether the condition was diagnosed or suspected during the lookback period.

Because the majority's reading of the policy is so narrow, it never engages with the record evidence Reliance reviewed in

denying Johnson's claim. But that evidence establishes that Reliance had reasonable grounds to conclude scleroderma was a preexisting condition. In his statement to Reliance, Johnson's own rheumatologist, Dr. Querubin, confirmed that Johnson first experienced symptoms of scleroderma in October 2015 and that he treated her for those symptoms "every 1–3" months during the lookback period. In the light of our deferential review, that admission alone is sufficient to establish that scleroderma was a "Sickness . . . for which [Johnson] received medical Treatment" during the lookback period. And there is nothing in the text of the policy that barred Reliance from so concluding because Dr. Querubin did not diagnose or suspect scleroderma during the lookback period.

Other healthcare professionals also consulted with Johnson about symptoms she acknowledges are symptoms of scleroderma. Nurse Practitioner Ashleigh Clark treated Johnson for fatigue and joint swelling. Johnson consulted Dr. Alan Maloon at Premier Neurosurgical Institute for fatigue, nausea, and swelling of the feet and hands. As already explained, Johnson even underwent a "diagnostic procedure," an upper gastrointestinal endoscopy, for gastrointestinal complaints. "Taken as a whole," those medical records "provide sufficient evidence to conclude that" Johnson suffered from scleroderma, which "equated to a 'Sickness or Injury' under the Reliance policy during the lookback period." *Ferrizzi*, 792 F. App'x at 686.

An exclusion for a pre-existing condition "serves the . . . purpose of protecting insurers from fraudulent applicants seeking

23-13443          WILLIAM PRYOR, C.J., Dissenting          11

coverage for known diseases." *Mogil*, 267 Cal. Rptr. at 491 (citation and internal quotation marks omitted). When insurance companies began using these exclusions, "they failed to expressly define the term" pre-existing condition in their policies. *Id*. So, courts interpreting the exclusions "adopt[ed] [a] general rule" to define them. *Id*. The majority of courts settled on the rule that a pre-existing condition exists when it becomes "manifest or active or when there is a *distinct symptom or condition* from which one learned in medicine can with reasonable accuracy diagnose the illness." *Id*. (emphasis added) (collecting cases); *see also Preferred Risk Life Ins. Co. v. Sande*, 421 So. 2d 566, 568 (Fla. Dist. Ct. App. 1982) (defining "manifest" as "when the sickness or disease becomes symptomatic and not necessarily when the exact nature of sickness or disease is diagnosed by a physician after extensive testing" (citation and internal quotation marks omitted)). It made sense not to base the excludability of a pre-existing condition on whether a doctor had yet diagnosed or suspected it by name during the lookback period. Otherwise, "unscrupulous applicants . . . fraudulently attempt[ing] to gain coverage" after experiencing serious symptoms could first obtain coverage and only later seek medical evaluation. *Mogil*, 267 Cal. Rptr. at 491 (citation and internal quotation marks omitted). A sickly yet *undiagnosed* applicant with symptoms XYZ is in the same position of a sickly, *diagnosed* applicant with the same symptoms. It would defy the purpose of the exclusion to give the former, but not the latter, benefits and to provide an ill person an incentive to obtain coverage before being medically evaluated.

12                 WILLIAM PRYOR, C.J., Dissenting                23-13443

I accept that Johnson, in good faith, diligently sought to dis-cover the cause of her symptoms, but the record makes plain that she displayed sufficient "symptom[s] or condition[s] from which one learned in medicine c[ould] with reasonable accuracy diagnose the illness." *Id.* Her lookback-period symptoms were the same as the symptoms her physician later stated were attributable to scle-roderma—joint pain and swelling, shortness of breath, persistent cough, digestive and gastrointestinal problems, and fatigue. That her doctors were temporarily unable to diagnose the cause of those symptoms as scleroderma does not change the fact that Johnson experienced and received treatment and diagnostic procedures for them well before she obtained insurance and now seeks benefits because of their disabling effect.

★     ★     ★

Ms. Johnson's condition is unfortunate, but the terms of her policy plainly contemplate that a condition need not be diagnosed or even suspected to be pre-existing. Because it was neither arbi-trary nor capricious for Reliance to conclude that scleroderma was a pre-existing condition under the terms of the policy exclusion, I would affirm.

I respectfully dissent.